UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X

ROBERT GRAHAM, and J.G., and infant,
by his Father and Natural Guardian
ROBERT GRAHAM,

              Plaintiff,          **MEMORANDUM AND ORDER**
                                     08-CV-3518 (KAM)(RML)

    -against-

CITY OF NEW YORK, WILLIAM GLENN,
ANDREW UGBOMAH, and JOHN and JANE
DOES 1 through 10, individually and
in their official capacities (the
names John and Jane Doe being
fictitious, as the true names are
presently unknown),

              Defendants.

-----------------------------------X

**MATSUMOTO, United States District Judge:**

        On August 27, 2008, Robert Graham ("Graham") and his

minor son, J.G. ("J.G.," together with Graham, "plaintiffs")

commenced this action against defendants the City of New York,

William Glenn, Andrew Ugbomah, and John and Jane Does 1 through

10 ("defendants"), alleging violations of their civil rights

pursuant to 42 U.S.C. § 1983, and state law claims of assault,

battery, intentional infliction of emotional distress, false

arrest, negligent screening, hiring and retention, negligent

training and supervision, negligence, *respondeat superior* and

malicious abuse of process.  Defendants now move for summary

judgment on all of plaintiff J.G.'s claims pursuant to Fed. R.

Civ. P. 56.  For the reasons set forth below, defendants'

motion is granted.

**BACKGROUND**

I.   **Procedural History**

On August 27, 2008, plaintiffs commenced this action

pursuant to 42 U.S.C. § 1983 against the City of New York and

John and Janes Doe 1 through 10.  Plaintiff filed an amended

complaint on February 9, 2009, adding as defendants William

Glenn and Andrew Ugbomah.  Discovery followed.

Defendants filed the pending motion, relating only to

plaintiff J.G.'s claims, on February 25, 2011.  Defendants move

for summary judgment on J.G.'s claims pursuant to Fed. R. Civ.

P. 56 on the grounds that: (1) J.G. has filed to establish a

violation of his Fourth Amendment rights; (2) J.G. has failed

to establish a violation of his due process right to be free

from interference with familial relations;[1] (3) defendants Glenn

and Ugbomah are entitled to qualified immunity; (4) J.G. has

failed to state any claims pursuant to New York State law; and

(5) J.G. has failed to establish any claims against defendant

City of New York.  (See ECF No. 43, Memorandum of Law in

Support of Defendants' Motion for Summary Judgment as to

Plaintiff J.G. ("Defs. Mem.").)  Plaintiff opposes defendants'

---

[1] Plaintiffs have voluntarily withdrawn their due process claim.  (Pl.
Mem. at 2 n.1.)

motion for summary judgment. (See ECF No. 44, Plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion for
Partial Summary Judgment ("Pl. Mem.").)

## II. <u>Undisputed Material Facts</u>

The following facts, taken from the parties'
statements pursuant to Local Civil Rule 56.1, are undisputed
unless otherwise indicated. The court has considered whether
the parties have proffered admissible evidence in support of
their positions and has viewed the facts in a light most
favorable to the nonmoving plaintiff.

On June 8, 2007, at approximately 5:51 p.m.,
defendants received notice that a woman was being assaulted in
the vicinity of Rockaway Parkway and Church Avenue in Brooklyn,
New York. (ECF No. 41, Defendants' Statement of Undisputed
Facts Pursuant to Local Civil Rule 56.1 ("Defs. 56.1 Stmt.") at
¶ 16.) Defendants drove northeast on Church Avenue towards the
scene of the incident in a marked police vehicle. (*Id.* at
¶ 17.) As the officers passed 96th Street on Church Avenue,
approximately one block from the location of the reported
assault, the officers pulled up to the right of a vehicle
stopped in traffic. (*Id.* at ¶ 18.) Plaintiff Graham was
driving the vehicle, and plaintiff J.G., who plaintiff Graham
had just picked up from a nearby daycare center, was seated in
a child's booster seat in the rear passenger's side of the

vehicle.  (*Id.* at ¶¶ 18-20; ECF No. 42, Ex. B, Deposition of
Robert Graham taken on July 22, 2009 ("Graham Dep.") at 68:16-
19.)  At the time, J.G. was a healthy four-year-old with no
medical conditions.  (Graham Dep. at 75:24-25; 76:8-20.)

Defendants activated the lights and sirens on the
patrol car as they approached plaintiff's vehicle from the
rear, indicating that plaintiff should pull his vehicle over.[2]
Plaintiff Graham testified that he was unable to move his
vehicle because there was no room to move his car to the side
or to back into the parking lane.  (ECF No. 47, Plaintiffs'
Response to Defendants' Statement of Undisputed Facts Pursuant
to Local Civil Rule 56.1 ("Pl. 56.1 Stmt.") at ¶¶ 21-22; Graham
Dep. at 68:24-25.)  Officer Glenn, on the other hand, testified
that Mr. Graham had room to move his vehicle, but refused to do
so without reason.  (Defs. 56.1 Stmt. at ¶¶ 23-24; ECF No. 42,
Exhibit E, Deposition of William Glenn taken on December 3,
2009 ("Glenn Dep.") at 71:10.)

Officer Glenn testified that he subsequently
approached plaintiff's vehicle and requested plaintiff's

---

[2] Although the parties appear to dispute whether the police
vehicle had its lights and sirens activated at the time it approached
plaintiff's vehicle, both Officer Glenn and plaintiff Graham testified that
Officer Glenn turned on the signals only when he pulled up behind Mr.
Graham's vehicle, and not before.  (Pl. 56.1 Stmt. at ¶ 21; ECF No. 42,
Deposition of Robert Graham taken on July 22, 2009 ("Graham Dep.") at 68:18-
21; Defs. 56.1 Stmt., Ex. E, Deposition of William Glenn taken on December 3,
2009 ("Glenn Dep.") at 50:18-20.)

registration, proof of insurance and license.  (Glenn Dep. at
89:10-12.)  A few minutes later, upon noticing that plaintiff
Graham had not provided his drivers' license, Officer Glenn
returned to ask plaintiff for the final piece of documentation.
(Defs. 56.1 Stmt. at ¶¶ 25-26; Glenn Dep. at 89:14-16.)
Plaintiff Graham, on the other hand, testified that initially,
Officer Glenn requested only his license, which plaintiff
produced, and took twenty minutes to return with it.  (Pl. 56.1
Stmt. at ¶¶ 25-26; Graham Dep. at 69:3-14.)

The parties agree that upon Officer Glenn's return to
plaintiff Graham's car, plaintiff Graham asked Officer Glenn
what he intended to do with his information.  (Defs. 56.1 Stmt.
at ¶ 27; Pl. 56.1 Stmt. at ¶ 27.)  Officer Glenn replied that
he was going to issue a summons to Graham for failing to move
his car when asked.  (Pl. 56.1 Stmt. at ¶¶ 27-28; Graham Dep.
at 107:11-22; Defs. 56.1 Stmt. at ¶¶ 27-28; Glenn Dep. at
110:12-14.)  Officer Glenn testified that plaintiff Graham
explicitly and immediately refused to provide his license
(Defs. 56.1 Stmt. at ¶ 29; Glenn Dep. at 109:19-22), whereas
plaintiff Graham testified that he tried to calmly explain why
he could not have reversed his vehicle (Graham Dep. at 108:14-
109:6).

The parties dispute what occurred next.  Officer
Glenn testified that he repeatedly ordered plaintiff Graham to

step out of his vehicle before grasping plaintiff's left wrist and right shoulder and removing him from the driver's seat, after which Graham came to a standing position outside "with his own force." (Defs. 56.1 Stmt. at ¶¶ 31-32; Glenn Dep. at 132:10-137:13.) Plaintiff Graham testified, on the other hand, that Officer Glenn dragged him from the vehicle without first requesting that he exit the vehicle himself. (Pl. 56.1 Stmt. at ¶¶ 31-32; Graham Dep. at 70:25-71:1-2.) It is undisputed that upon plaintiff Graham's exit from the vehicle, Officer Glenn placed plaintiff Graham in handcuffs. (Defs 56.1 Stmt. at ¶ 33; Pl. 56.1 Stmt. at ¶ 33.)

Meanwhile, four-year-old plaintiff J.G. remained restrained in his car seat for "several minutes," while Mr. Graham stood outside, "pretty close" to the car. (ECF No. 45, Declaration of Robert Graham in Opposition to Defendants' Motion for Summary Judgment ("Graham Decl.") at ¶ 6.) The parties agree that J.G. became visibly upset and began crying when Mr. Graham exited the car. (Glenn Dep. at 181:13-21; ECF No. 42, Ex. D, Deposition of J.G. taken on November 9, 2010 ("J.G. Dep.") at 17:9-19; Graham Dep. 71:2-5.) J.G. testified that being alone in the car frightened him. (J.G. Dep. at 17:9-19.) It is undisputed that, during the time J.G. was alone in the car, the car doors were closed. (Glenn Dep. at 179:14-16; ECF No. 42, Ex. C, Deposition of Yvonne Fraser taken

on February 23, 2010 ("Fraser. Dep.") at 28:19-21.) Officer Glenn testified that he believed that the doors were locked, but plaintiff J.G. testified that the doors were open. (Glenn Dep. at 179:14-16; J.G. Dep. at 19:1-3.) It is also undisputed that, during this time, the car was likely not air-conditioned. (Glenn Dep. at 180:12; Graham Dep. at 78:13-15.) The parties dispute whether any of the car windows were open. Officer Glenn testified that the driver's seat window was open, allowing ventilation through the car, while Ms. Fraser, who witnessed the scene from "a few feet away," testified that none of the car windows was open. (Fraser Dep. at 28:22-24.) Plaintiff testified that he initially spoke to Officer Glenn and handed his license through his window. (Graham Dep. at 69:22-70:3.) Officer Glenn testified that he could not remember whether it was a hot day, though he recalled that, at the time of these events, it was still light outside and it was not raining. (Glenn Dep. at 180:9-23.) Officer Glenn also testified that he spoke to J.G. through the open window of the driver's seat in an attempt to comfort him, though J.G. does not mention this conversation in his deposition. (Glenn Dep. at 179:23-24; 180:24-181:12.)

Standing outside of the car, Officer Glenn asked plaintiff Graham if there was another family member who could come collect J.G. from the car. (Defs. 56.1 Stmt. at ¶ 34; Pl.

56.1 at ¶ 34).  Plaintiff Graham further testified that Officer
Glenn told him that J.G. would be taken to Child Services if a
family member did not show up to care for J.G.  (Pl. 56.1 Stmt.
at ¶ 34; Graham Dep. at 71:13-16.)

During the exchange between Graham and Officer
Glenn, Yvonne Fraser ("Ms. Fraser"), a bystander, identified
herself as a relative of the director of J.G.'s daycare and an
acquaintance of plaintiff Graham.  (Defs. 56.1 Stmt. at ¶ 35;
Pl. 56.1 Stmt. at ¶ 35.)  Ms. Fraser offered to take J.G. to
the daycare center and contact J.G.'s mother, plaintiff
Graham's wife, to tell her what had occurred.  (Defs. 56.1
Stmt. at ¶ 36; Pl. 56.1 Stmt. at ¶ 36.)  It is undisputed that
Mr. Graham, still standing outside of his vehicle, did not
object to Ms. Fraser's offer to take J.G. to the daycare
center.  (Defs. 56.1 Stmt. at ¶ 37; Pl. 56.1 Stmt. at ¶ 37.)
At no point during the course of these events did defendants
have any physical contact with J.G. or issue any commands to
him.  (Defs. 56.1 Stmt. at ¶ 42; Pl. 56.1 Stmt. at ¶ 42.)
Moreover, J.G. testified that he did not feel as though he
himself was being arrested.  (Defs. 56.1 Stmt. at ¶ 43; J.G.
Dep. at 17:23-24.)

Thereafter, Ms. Fraser returned with J.G. to the
daycare center.  (Defs. 56.1 Stmt. at ¶ 38; Pl. 56.1 Stmt. at
¶ 38.)  She offered J.G. something to eat (Defs. 56.1 Stmt. at

¶ 38; Pl. 56.1 Stmt. at ¶ 38), and called his mother to explain what had taken place and ask her to come pick J.G. up (Fraser Dep. at 36:3-5; J.G. Dep. at 21:9-19).

After J.G.'s departure from the scene, Officer Glenn placed Graham in the patrol car, where he remained for approximately 30-45 minutes, until Officer Glenn issued him a summons for disorderly conduct and released him from custody. (Defs. 56.1 Stmt. at ¶¶ 39-40; Pl. 56.1 Stmt. at ¶¶ 39-40.) Within five minutes of being released from custody, Graham arrived at J.G.'s daycare center and took custody of J.G. (Defs. 56.1 Stmt. at ¶ 41; Pl. 56.1 Stmt. at ¶ 41.)

## DISCUSSION

### I.    Summary Judgment Standard

The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A fact is 'material' for these purposes when it 'might affect the outcome of the

suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party.  *Id.*  Nevertheless, the nonmoving party may not rest merely on allegations or denials but must instead set out specific facts showing a genuine issue for trial.  *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (citations omitted).

## II. **Application**

### A. Fourth Amendment Claims

#### a. Whether J.G. was "Seized"

Defendants first argue that "[plaintiff] cannot establish a violation of his Fourth Amendment rights because defendants undertook no intentional acts directed at him." (Defs. Mem. at 4.)  Specifically, defendants contend that their actions were not directed at plaintiff J.G., but rather, that they undertook intentional acts directed only at plaintiff Graham, plaintiff's father, while J.G. sat in the back seat of the car.  (*Id.* at 4-5.)  Defendants further assert that plaintiff J.G. was not the object of any physical contact or verbal commands from defendant police officers.  (*Id.* at 5.) In response, plaintiff contends that, in closing the car door, Officer Glenn "at least arguably" intended to confine J.G. and, therefore, violated J.G.'s Fourth Amendment rights.  (Pl. Mem. at 13.)  In reply, defendants argue that plaintiff has failed to offer "anything beyond bare speculation to establish that defendants took any intentional acts directed at J.G."  (ECF No. 48, Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment As To Plaintiff J.G. ("Defs. Reply Mem.") at 3.)  Specifically, defendants argue that there is no evidence that Officer Glenn closed the car door with the intent to confine J.G.  (*Id.*)  Therefore,

defendants argue, plaintiff has failed to sufficiently allege a seizure within the meaning of the Fourth Amendment. (*Id.*)

The court agrees with defendants that "a seizure in violation of the Fourth Amendment requires an *intentional* acquisition of physical control." (*Id.* at 2 (citing *Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir. 1998)).) For the reasons set forth below, however, the court need not decide whether defendants intentionally seized J.G. within the meaning of the Fourth Amendment because, as set forth below, the court finds that defendants acted reasonably and, therefore, are not liable to J.G. for a § 1983 violation.

### b. Whether the Alleged Seizure was Reasonable

Defendants next argue that, even assuming that J.G. was seized, their treatment of J.G. was reasonable within the meaning of the Fourth Amendment. (Defs. Mem. at 5-7.) For the reasons set forth below, the court agrees that J.G. cannot establish a violation of his Fourth Amendment rights because defendants acted reasonably.

Defendants argue that "[e]ven assuming, *arguendo*, that J.G. was seized by defendants within the meaning of the Fourth Amendment, he has failed to establish a violation of his rights because defendants acted reasonably in their handling of his seizure by allowing a friend of the Graham family to take J.G. to his nearby daycare center." (Defs. Mem. at 5.)

Plaintiff responds that "because there was no probable cause to arrest Robert Graham [J.G.'s father], the seizure of J.G. incident to Mr. Graham's arrest was necessarily unreasonable." (Pl. Mem. at 14.) In reply, defendants argue that plaintiff's "false arrest analysis is inapplicable to J.G.'s claim" because J.G. was neither arrested nor detained on suspicion of criminal activity, and, further, whether probable cause existed for J.G.'s father's arrest is immaterial to the reasonableness of J.G.'s seizure. (Defs. Reply Mem. at 3-5.)

For the reasons set forth below, the court agrees with defendants that even if J.G. was seized, defendants acted reasonably in temporarily confining the four-year-old plaintiff to the vehicle which was stopped in a driving lane next to heavy passing traffic (*see* Pl. Mem. at 6), and by allowing a friend of the Graham family to take J.G. to his nearby daycare center. "[A]ssuming that Defendants' actions constituted a seizure, [plaintiff] must still show that a genuine issue of material fact exists whether the seizure was reasonable to survive summary judgment." *Matheny v. Boatright*, 970 F. Supp. 1039, 1046 (S.D. Ga. 1997) (holding that defendant police officers acted reasonably in detaining minor plaintiffs in police car and at police station during plaintiffs' mother's arrest and, therefore, were entitled to summary judgment). *See also Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)

("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable" given the circumstances of its occurrence in order to incur § 1983 liability) (internal quotations omitted).

Where a minor plaintiff is detained not on suspicion of criminal activity but, rather, as incident to their parent or guardian's arrest, it is "inappropriate to apply the traditional false arrest inquiry to their civil rights claim." *Armatas v. Maroulleti,* No. 08-CV-310, 2010 U.S. Dist. LEXIS 112921, at *33 (E.D.N.Y. Oct. 19, 2010), *adopted in relevant part by* 2010 U.S. Dist. LEXIS 112908 (E.D.N.Y. Oct. 22, 2010) (holding that where minor plaintiffs were seized as incident to their father's arrest, the relevant inquiry was not whether there was probable cause but, rather, whether the seizure was reasonable); *see also Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (quoting *Michigan v. Summers*, 452 U.S. 692 (1981)) ("[I]n cases involving seizures short of traditional arrest the courts should be guided by 'the ultimate standard of reasonableness embodied in the Fourth Amendment.'").

Here, it is undisputed that even if plaintiff J.G. was seized, he was not seized on suspicion of criminal activity. (*See generally* Defs. 56.1 Stmt. at ¶ 30 (stating the facts leading up plaintiff Graham's arrest); J.G. Dep. at 17:23-24.) Rather, plaintiff's alleged seizure was incident to

14

his father's arrest.  Thus, the relevant inquiry, as in *Armatas*, is whether the alleged seizure of J.G. was reasonable.

"Determining the reasonableness of a seizure requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Matheny*, 970 F. Supp. at 1046 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1985)).  This court recently held in *Armatas* that it was reasonable for police officers to detain arrestee's two young children as they accompanied their father from their home to the police station where their father was unable to make arrangements for another family member to watch the children.  *Armatas*, 2010 U.S. Dist. LEXIS 112921, at *33-35 ("It is undisputed that the children were brought to the station with Armatas because he could not secure childcare.").  The court in *Armatas* relied upon other courts' decisions finding reasonable police officers' detention of minor children as incident to their parent or guardian's arrest, where there was no other adult available to care for the children.  *See Cherrington*, 344 F.3d at 639-40 (holding that where police arrested minor plaintiff's mother at 2:30 a.m., when it was unlikely that other arrangements could be made for plaintiff's care, it was not necessarily unreasonable for police to detain minor plaintiff with her mother in a motel room for 24 hours

while the mother cooperated in arranging a drug bust); *Matheny*, 970 F. Supp. at 1044, 1046 (holding that where police arrested minor plaintiffs' mother in the early hours of the morning, it was not unreasonable to detain minor plaintiffs along with their mother in the police station for an hour and a half until their mother was allowed to make arrangements for the children to be picked up by relatives). *C.f. Martini v. Russell*, 582 F. Supp. 136 (C.D. Cal. 1984) (holding that it was unreasonable for police to incarcerate a mother and her five children, ages 1-8, in a holding cell, when other detention facilities were available and when the police had failed to inform plaintiffs that they were being arrested and failed to provide reason for their detention).

The court finds that defendants' behavior toward plaintiff J.G. was reasonable and, therefore, was not a violation of plaintiff's Fourth Amendment rights. Four-year-old plaintiff J.G. was confined to the car for "several minutes" on a summer day while his father stood outside, "pretty close" to the car. (Graham Decl. at ¶ 6; Graham Dep. at 118:3-5.) It is undisputed that there was heavy traffic on the street and that plaintiff's vehicle was in a driving lane. (Pl. Mem. at 6.)

On the one hand, the doors of the car in which J.G. sat were closed and the car was not air conditioned. (Glenn

Dep. at 179:14-16; 180:3-15; Fraser Dep. at 28:19-21; Graham
Dep. at 78:14-25.)  On the other hand, only a few minutes after
J.G.'s father exited the car, Ms. Fraser, who had been
witnessing the scene, identified herself and offered to escort
J.G. to the nearby daycare center and contact his mother.
(Defs. 56.1 Stmt. at ¶¶ 35, 36; Pl. 56.1 Stmt. at ¶¶ 35, 36.)
Plaintiff Graham and defendant Glenn consented to Ms. Fraser
taking J.G. to the daycare center.  (Defs. 56.1 Stmt. at ¶ 37;
Pl. 56.1 Stmt. at ¶ 37.)  Ms. Fraser subsequently escorted J.G.
from the car to his school, where she provided him with food
and a beverage (Defs. 56.1 Stmt. at ¶ 38; Pl. 56.1 Stmt. at
¶ 38), and comforted him (Fraser Dep. at 35:2-5; 35:21-25;
36:1-5).  Approximately 30-45 minutes later, Mr. Graham was
released from police custody, and within five minutes of his
release, he picked up his son from school.  (Defs. 56.1 Stmt.
at ¶¶ 40-41; Pl. 56.1 Stmt. at ¶¶ 40-41.)

        First, the court finds that given plaintiff's age and
the fact that the car was stopped on a busy street, it was
reasonable for defendants to confine J.G. to the car for a few
minutes until arrangements could be made for his care.
Undoubtedly, it would have been unreasonable for defendants to
allow plaintiff J.G. to exit the car, exposing him to the
dangers of the traffic-congested street.  *C.f. White v.
Rochford*, 592 F.2d 381, 384-86 (7th Cir. 1979) (holding that

17

where defendant police officers arrested minor plaintiffs'
uncle and abandoned minor plaintiffs in their uncle's car,
thereby allowing them to cross eight lanes of traffic in search
of a telephone to call their parents, defendants violated
plaintiff's substantive due process rights). *See also*
*Cherrington*, 344 F.3d at 637 (explaining that Fourth Amendment
analysis and substantive due process analysis produce the same
outcome).

Furthermore, the duration of plaintiff's confinement
was "several minutes," considerably shorter than the
confinements in *Armatas, Matheny* and *Cherrington*, where minor
plaintiffs were confined during travel time from their
respective homes to police stations, in addition to the time
they were confined at the police stations. *Armatas*, 2010 U.S.
Dist. 112921, at *7-8 ("the boys were brought along to the
station" and remained there while their father was escorted
through the precinct to be fingerprinted and until he was
released); *Matheny*, 970 F. Supp. at 1041 (police officers
removed minor plaintiffs from their home at approximately 5:30
a.m. and released them in the custody of their aunt and
grandmother at approximately 7:00 a.m.); *Cherrington*, 344 F.3d
at 635 (police officers removed minor plaintiff from her home
at approximately 2:30 a.m. on August 30, 1997 and released her
in the custody of her mother's friend over 24 hours later at

3:37 a.m. on August 31, 1997).  Nor was plaintiff J.G. removed
from his family car or home or transported by the police to any
other location.  (Defs. 56.1 Stmt. at ¶ 38; Pl. 56.1 Stmt. at
¶ 38 (noting that Ms. Fraser, not the police, transported J.G.
from his father's car).)

Finally, it is undisputed that, like the plaintiff in
*Matheny*, plaintiff J.G. here was, at no point, physically
touched or harmed by the defendants (Defs. 56.1 Stmt. at ¶ 42;
Pl. 56.1 Stmt. at ¶ 42), nor did defendants speak to him
harshly or abusively.  *See Matheny*, 970 F. Supp. at 1046
("Matheny does not contend that Defendants had any physical
contact with the children.  Nor does she claim that the
children suffered any physical injury inflicted by defendants.
Matheny also does not claim that Defendants directed any harsh
or abuse language at the children.")

Under these circumstances, the court finds that
defendants acted reasonably in holding J.G. in the car for a
few minutes while they detained his father.  Accordingly, the
court finds that defendants did not violate plaintiff's Fourth
Amendment rights.

## B. Interference with Familial Relations Claim

Defendants next argue that J.G. has failed to
establish a violation of his due process right to be free from
interference with familial relations because (1) J.G.'s claim

is properly considered under the Fourth Amendment, rather than pursuant to substantive due process; and (2) because even under the substantive due process analysis, J.G. has not demonstrated that defendants' conduct was "shocking, arbitrary, and egregious." (Defs. Mem. at 8-9.) In response, plaintiff J.G. withdraws his claim for violation of his due process right to be free from interference with familial relations. (Pl. Mem. at 2 n.1.) Accordingly, plaintiff J.G.'s claim for interference with familial relations is moot and is dismissed.

### C. Qualified Immunity

Next, individual defendants Glenn and Ugbomah argue that they are entitled to qualified immunity "because reasonable officers could have believed that their behavior was not unconstitutional." (Defs. Mem. at 10.) Specifically, defendants argue that "assuming defendants had custody of J.G. for some amount of time, it was imminently reasonable for him to be taken back to his daycare center to wait for one of his parents to pick him up. Faced with the option of placing J.G. in the police vehicle with his father, abandoning him on the side of the road, or calling ACS to take custody of him, defendants['] actions with respect to J.G. were clearly the most logical and reasonable of decisions." (*Id.* at 11.) In response, plaintiff argues that "no police officer of reasonable competence could have thought that there was

probable cause to arrest Mr. Graham, and thus no such officer could have thought that seizure of J.G. incident to that arrest would be lawful." (Pl. Mem. at 15-16.)

The court finds that having concluded that plaintiff J.G. has failed to state a federal claim against defendants, it need not consider whether defendants are entitled to qualified immunity with respect to J.G.'s federal claims.

### D. State Law Claims

In cases in which district courts have original jurisdiction, the courts also have jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Now that the court has dismissed J.G.'s federal claims, the question arises whether the court should continue to exercise jurisdiction over his remaining state-law claims.

Section 1367(c) allows the court to decline to exercise supplemental jurisdiction if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are

other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). Here, clauses (1) and (2) do not apply, as plaintiff J.G.'s state law claims of false arrest and negligent infliction of emotional distress are not so novel or complex to justify declining jurisdiction and those claims do not predominate over the federal claims of co-plaintiff Graham which are still pending.

Section 1367(c)(3) allows a district court to decline to exercise jurisdiction if all federal claims have been dismissed. Here, although, as set forth above, the court has dismissed plaintiff J.G.'s federal claims, co-plaintiff Graham's federal claims are still pending. Accordingly, § 1367(c) does not apply to the instant case.

Finally, the court may decline to exercise supplemental jurisdiction "in exceptional circumstances." 28 U.S.C. § 1367(c)(4). The Second Circuit has explained that this "catch-all" provision requires "compelling circumstances, such that "declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998). This case presents no such circumstances.

Accordingly, the court has jurisdiction to resolve plaintiff J.G.'s state law claims.

### a. False Arrest and Immunity

Defendants argue that plaintiff J.G. has failed to establish a claim for false arrest because he has failed to establish that defendants intended to confine plaintiff and that plaintiff was aware of his confinement. (Defs. Mem. at 12.) Defendants further argue that their confinement of J.G. was privileged because it was reasonable and for the purpose of "ensur[ing] the child's wellbeing," and, had they failed to protect J.G.'s wellbeing, they could have incurred civil liability. (*Id.* at 13.) Finally, defendants argue that they are entitled to immunity under New York state common law because defendant Officers Glenn and Ugbomah were "exercising the discretion and judgment inherent to [their] job[s]" throughout their interaction with J.G. (*Id.* at 14 (citing *Estate of Yankel Rosenbaum v. City of New York*, 982 F. Supp. 894 (E.D.N.Y. 1997)).)

Plaintiff responds that Officer Glenn "at least arguably intended to confine J.G., notwithstanding that arresting Mr. Graham was [Officer Glenn's] principal focus" and further contends that the fact "[t]hat J.G. did not believe that he was being arrested is irrelevant." (Pl. Mem. at 17.) In response to defendants' argument that J.G.'s confinement was privileged, plaintiff contends that "Officer Glenn would not have had to account for J.G.'s safety had he not arrested Mr.

Graham (without probable cause) in the first place." (*Id*. at 18.)

The court finds that there are no disputed issues of material fact regarding defendants' intent to confine plaintiff and plaintiff's awareness of his confinement. The court finds, further, that even if defendants had intended to confine J.G., and J.G. had been aware of his confinement, defendants would be entitled to immunity under New York state common law.

The elements of a false arrest claim under New York law "are substantially the same as the elements of a false arrest claim under" section 1983. *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (internal quotations omitted).[3] Specifically, under New York law, plaintiff must establish: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 373 N.Y.S.2d 87, 93 (1975)).

First, the court finds that plaintiff has failed to establish that there is a dispute of material fact regarding

---

[2] Plaintiff contends that "'[t]he standard for a claim of false arrest against the City under New York law is different from that under Section 1983.'" (Pl. Mem. at 18 (citing *Jenkins v. City of New York*, 478 F.3d 76, 95 n.21 (2d Cir. 2003)).) The court discusses plaintiff J.G.'s claims against the City of New York *infra*.

whether Officer Glenn intended to confine him. Plaintiff
contends that "in blocking J.G.'s exit from Mr. Graham's
vehicle after dragging Mr. Graham from the vehicle, Officer
Glenn at least arguably intended to confine J.G.,
notwithstanding that arresting Mr. Graham was his principal
focus." (Pl. Mem. at 17.) Plaintiff, however, fails to
provide any evidence of Officer Glenn's intent toward J.G. and
concedes that arresting Mr. Graham was Officer Glenn's
"principal focus." (*Id.*) Officer Glenn admitted that, J.G.
appeared to be a young toddler who could not be left alone or
released on his own, and that his training and experience
required that he take responsibility for the child until he
could be released to another parent, guardian or ACS. Thus,
J.G. did not have the ability to leave the vehicle in which he
was confined. (Glenn Dep. at 175:8-177:7.)

Further, it is undisputed that, on the day in
question, plaintiff J.G. had been placed in his child's booster
seat by his father, before plaintiff Graham had any interaction
with the defendants. (Defs. 56.1 Stmt. at ¶¶ 19-20; Pl. 56.1
Stmt. at ¶¶ 19-20.) When defendants later removed plaintiff
Graham from his car, at no point did defendants physically
touch J.G. or move him from the booster seat in which his
father had placed him. (Defs. 56.1 Stmt at ¶ 42; Pl. 56.1
Stmt. at ¶ 42 ("At no time during the incident did defendants

have physical contact with J.G. . . . .").)  Nor did
defendants, at any time, issue any commands to J.G., except
that Officer Glenn spoke to the child in an effort to comfort
him.  (Defs. 56.1 Stmt at ¶ 42; Pl. 56.1 Stmt. at ¶ 42; Glenn
Dep. at 181:9-21.)  For the foregoing reasons, the court finds
that, based on the undisputed admissible evidence, defendants
intended to confine J.G.

Second, the court finds that plaintiff has failed to
establish that there is a dispute of material fact regarding
whether plaintiff J.G. was aware of his confinement.  Plaintiff
J.G. contends that the fact that he did not believe that he was
being arrested is irrelevant to the inquiry of whether he was
aware of his confinement.  (Pl. Mem. at 17 (citing *Parvi v.
City of Kingston*, 41 N.Y.2d 553, 555-56 (1977)).)  Plaintiff
has not offered any admissible evidence, however, that he was
aware of his confinement.  Rather, J.G. testified that he was
aware of being separated from his father, who was outside the
car.  Moreover, J.G. testified that the car doors were open.
(J.G. Dep. at 19:1-3.)  Further, J.G. testified that he was
screaming when his father got out of the car because he was
alone and scared, not because he felt confined.  (J.G. Dep. at
17:9-12 (testifying that he was screaming because "I was, like,
by myself and there was no one, you know, there in the car and
I was, you know, scared.").)  Rather than establish J.G.'s

awareness of his confinement, J.G.'s testimony points to J.G.'s

distress at being temporarily separated from his father.

Accordingly, the court finds that plaintiff has failed to

establish a disputed issue of material fact regarding whether

he was aware of his confinement.

Moreover, even if J.G. was aware of his confinement,

defendants are entitled to immunity under New York state law.

"New York immunity law 'affords public officials considerably

greater protection from individual capacity suits than the

federal doctrine of qualified immunity.'" *Estate of Yankel*

*Rosenbaum*, 982 F. Supp. at 895 (quoting *Hirschfeld v. Spanakos*,

909 F. Supp. 174, 180 (S.D.N.Y. 1995)).

> Whether an action of a governmental
> employee . . . is cloaked with any
> governmental immunity requires an analysis
> of the functions and duties of the actor's
> particular position and whether they
> inherently entail the exercise of some
> discretion and judgment . . . . If a
> functional analysis of the actor's position
> shows that it is sufficiently discretionary
> in nature to warrant immunity, it must then
> be determined whether the conduct giving
> rise to the claim is related to an exercise
> of that discretion.

*Id*. at 895-96 (citing *Mon v. City of New York*, 574 N.Y.S.2d

529, 532 (1991)). Discretionary acts "involve the exercise of

reasoned judgment which could typically produce different

acceptable results whereas a ministerial act envisions direct

adherence to a governing rule or standard with a compulsory

result." *Id.* at 896 (citing *Tango v. Tulevech*, N.Y.S.2d 73, 77 (1983)).  A police officer's decision regarding the appropriate law enforcement strategy to implement is "quintessentially" one of discretion.  *Id.* (holding that defendant police officers were entitled to summary judgment and state immunity because their decisions regarding how to respond to race riots were inherently discretionary decisions).

Here, Officer Glenn's and Ugbomah's decisions regarding plaintiff J.G. "involve[d] the exercise of reasoned judgment which could typically produce different acceptable results." *Id.* at 896.  Specifically, defendants' decision to keep J.G. in his father's car for "several minutes" until arrangements were made for J.G.'s care by a friend of the Graham family and relative of J.G.'s daycare center director was reasonable and an appropriate exercise of discretion. (Defs. 56.1 Stmt. at ¶ 35; Pl. 56.1 Stmt. at ¶ 35.)

For the foregoing reasons, even assuming that plaintiff had been aware of his confinement, which he was not, defendants are entitled to state immunity.[4]

### b. Negligent Infliction of Emotional Distress

Defendants next argue that plaintiff has failed to

---

[3] Because the court finds that defendants are entitled to immunity under New York state law, the court need not address the parties' arguments pursuant to New York Family Court Act § 1024(a).  (Defs. Mem. at 12; Pl. Mem. at 17-18.)

establish a claim for negligent infliction of emotional distress ("NIED") under either the bystander theory or the direct duty theory. (Defs. Mem. at 13.) Specifically, defendants argue that plaintiff has failed to establish a claim under the bystander theory because plaintiff was not threatened with physical harm as a result of defendants' negligence and did not suffer emotional injury as a result of witnessing the death or serious bodily injury of an immediate family member. (Defs. Mem. at 13 (citing *Bovsun v. Sanperi*, 473 N.Y.S.2d 357 (1984)).) Defendants argue that plaintiff has failed to establish a claim under the direct duty theory because plaintiff did not suffer emotional injury as the result of defendant's breach of a duty, which unreasonably endangered plaintiff's physical safety. (*Id.* at 13-14 (citing *Kennedy v. McKesson Co.*, 462 N.Y.S.2d 421 (1983); *Green v. Leibowitz*, 500 N.Y.S.2d 146, 148 (2d Dept. 1986)).) Plaintiff responds that in "dragging Mr. Graham from his vehicle for no apparent reason, leaving J.G. alone -- screaming -- inside of the vehicle," defendants breached a duty to J.G. that "'directly result[ed] in emotional harm' to J.G." (Pl. Mem. at 18 (citing *Kennedy*, 462 N.Y.S.2d at 423).) In reply, defendants respond that because plaintiff J.G. failed to cite legal authority for defendants' alleged duty to plaintiff and because plaintiff does not allege that his physical safety was unreasonably

endangered, plaintiff's claim under the direct duty theory fails.  (Defs. Reply Mem. at 7.)

The court holds that J.G's NIED claim fails under both the bystander theory and under the direct duty theory. First, under the bystander theory, plaintiff's claim fails because plaintiff did not witness the death or serious bodily injury of a close family member.

Second, under the direct duty theory, plaintiff must show that he suffered emotional injury as the result of defendant's breach of a duty, which unreasonably endangered plaintiff's physical safety.  *Green*, 500 N.Y.S.2d 146 at 148; *see also Wolkstein v. Morgenstern*, 713 N.Y.S.2d 171, 173 (1st Dep't 2000).  In determining whether a defendant owes a legally recognized duty of care to a plaintiff, "[c]ourts traditionally fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, the disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Hamilton v. Beretta U.S.A. Corp.*, 727 N.Y.S.2d 7, 12 (2001) (internal quotations omitted).  Here, plaintiff fails to provide admissible evidence or legal authority for his contention that defendants breached the duty of care they owed

him.  Further, for the reasons set forth above, the court finds
that defendants acted reasonably and did not breach their duty
to plaintiff.

Moreover, plaintiff fails to provide evidence or
allege that his physical safety was, at any point, unreasonably
endangered.  Courts are reluctant to impose liability where
plaintiff has not suffered physical injury.  *See, e.g.,*
*Broadnax v. Gonzalez*, 777 N.Y.S.2d 416, 419 (2004).  Where a
plaintiff is not exposed to risk of bodily harm, a plaintiff's
physical safety is not unreasonably endangered.  *See Kennedy*,
462 N.Y.S.2d at 425 (plaintiff dentist was unable to recover
damages for a NIED claim against an anesthetic machine
manufacturer whose faulty repair of machine caused plaintiff to
accidentally suffocate a patient with nitrous oxide because
plaintiff himself was not exposed to bodily harm).  *See also De*
*Rosa v. Stanley B. Michelman, P.C.*, 584 N.Y.S.2d 202, 203 (2d
Dept. 1992) (affirming lower court's dismissal of plaintiff's
NIED claim for failure to allege that defendant's conduct
endangered plaintiff's physical safety).  The court finds that,
given that J.G. was a healthy four-year-old who sat in his
family car for only "several minutes" at approximately 5:51
p.m. in the afternoon while his father stood "pretty close" to
the car, J.G.'s physical safety was not unreasonably
endangered.  (Graham Decl. at ¶ 6; Graham Dep. at 76:8-20,

118:5.)  Accordingly, plaintiff J.G.'s claim of negligent

infliction of emotional distress is dismissed.

### E. Claims against the City of New York

Defendants argue that, notwithstanding that the

Complaint is ambiguous as to whether plaintiff J.G. is

asserting claims against the City of New York in addition to

the claims asserted by plaintiff Graham, J.G.'s claims against

the City should be dismissed because there is no evidence in

the record that defendants acted outside the scope of their

employment.  (Defs. Mem. at 15-16.)  In response, plaintiff

J.G. argues that defendants' motion on his claims against the

City of New York is premature because plaintiffs have "reserved

the right to retain experts to testify in support of their

*Monell,* negligent training and supervision, and *respondeat*

*superior* claims against the City, as well as with respect to

damages."  (Pl. Mem. at 20.)

Although plaintiff J.G. argues defendants' motion on

his claims against the City is premature, plaintiff

acknowledges that the parties agreed that the "pre-trial

summary judgment motion would be made as to J.G.'s claims

only." (Pl. Mem. at 19.)  A plain reading of this argument

suggests that the parties were aware that defendants would move

for summary judgment against all of plaintiff J.G.'s claims.

Further, the court finds nothing in Magistrate Judge Levy's

Order excepting J.G.'s potential claims against the City of New York from defendants' summary judgment motion.

The parties' disagreement about whether they reserved the right to continue *Monell* discovery is irrelevant because, as discussed above, plaintiff has not established that he was deprived of any constitutionally protected right. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *see also Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009) (affirming summary judgment dismissal of *Monell* claim where court dismissed all of plaintiff's Section 1983 claims); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a *Monell* claim). That is, "[i]f there is no underlying constitutional violation by a municipal official, the municipality is not liable." *Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001); *see also Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 219 (E.D.N.Y. Mar. 5, 2010) (dismissing *Monell* claims against a county where the court dismissing all of the plaintiff's Section 1983 claims against the county's police officers that were acting in their official capacities).

The *Monell* claims of plaintiff J.G. must therefore be dismissed.

Although "there are limited exceptions to this rule where the injuries complained of are not solely attributable to the actions of named individual defendants, or where a jury concludes that the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity," neither of these exceptions applies here. *See Bonilla v. Jaronczyk*, 354 F. App'x 579, 582 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also Rutigliano*, 326 F. App'x at 8 (observing that a municipality may be found liable under Section 1983 even in the absence of individual liability "only in very special circumstances.") (citing *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (holding that the district court should have permitted the jury to decide whether the municipal defendants were liable irrespective of the liability of the individual defendants where there was evidence that a multi-member commission may have violated the plaintiff's First Amendment rights)).

Here, plaintiff J.G's *Monell* claim is directly derived from Officer Glenn's alleged wrongdoing. There is no evidence that anyone other than Officers Glenn and Ugbomah had any interaction with plaintiff. Because there is no evidence that plaintiff J.G.'s alleged injuries are attributable to

anyone other than the named defendants, and because the court has found that plaintiff J.G. did not suffer any constitutional injury at the hands of any individual police officer, the court grants the defendants' motion for summary judgment on J.G.'s *Monell* claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

**SO ORDERED.**

Dated:     August 17, 2011
           Brooklyn, New York


                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York